Gary Miller (pro hac vice)
(gmiller@shb.com)
Jesse Camacho (pro hac vice)
(jcamacho@shb.com)
Mary Jane Peal (pro hac vice)
(mpeal@shb.com)
Tony M. Diab (SBN 277343)
(tdiab@shb.com)
SHOOK, HARDY & BACON L.L.P.
Jamboree Center
5 Park Plaza, Suite 1600
Irvine, California 92614
Telephone: 949.475.1500
Facsimile: 949.475.0016

Attorneys for Plaintiff
TELESIGN CORPORATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TELESIGN CORPORATION,<br><br>   PLAINTIFF,<br><br>v.<br><br>TWILIO, INC.,<br><br>   DEFENDANT. | ) Case No. 2:16-cv-02106-PSG-SS<br>)<br>) **FIRST AMENDED COMPLAINT**<br>) **FOR PATENT INFRINGEMENT**<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>) |

   Plaintiff TeleSign Corporation brings this First Amended Complaint for patent infringement against Defendant Twilio, Inc. as follows:[1]

---

[1] Headings are included for readability; the allegations under any given heading are not intended to relate solely to that heading and vice versa. All allegations may be applicable to any Section, Count, or request (and each is incorporated by reference into the other).

## I.  Introduction and Parties

**1.**     Plaintiff TeleSign is a California corporation, duly authorized to do business in the State of California, with its principal place of business in Marina Del Rey, California.

**2.**     TeleSign is an industry leader in Internet security and user authentication. TeleSign has been one of the fastest-growing technology companies in North America, has sold to some of the top websites in the world, and has been recognized as a market leader in two-step-verification technology.

**3.**     TeleSign helps its customers secure billions of end-user accounts worldwide and prevent registration fraud.

**4.**     As explained herein, Twilio's infringement has harmed TeleSign.  Without authorization, Twilio has made, sold, offered to sell, used and/or imported products and services that infringe TeleSign's patent, and has induced others to infringe TeleSign's patent rights.

**5.**     Defendant Twilio is a Delaware corporation with its principal place of business in San Francisco, California.  Twilio maintains its principal place of business at 645 Harrison Street, San Francisco, California 94107 and can be served at 2710 Gateway Oaks Dr. Ste. 150N, Sacramento, California 95833.

**6.**     Twilio is reportedly part of the so-called "unicorn club" of companies that are valued at over $1 billion.

**7.**     Since Twilio's initial public offering, it reportedly has a market capitalization over $1 billion.

## II. TeleSign I

**8.**     TeleSign has asserted three patents against Twilio (Patent Nos. 7,945,034; 8,462,920 and 8,687,038), in Case No. 2:15-cv-03240-PSG-SS ("*TeleSign I*"), which was filed in this Court on April 30, 2015, and assigned to the Honorable Philip

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Gutierrez.  The patent asserted in this case is a child descendant of the '920 and '038 patents.

### III. Jurisdiction and Venue

**9.**    This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 1 et seq., including §§ 271 and 281.  Thus, this Court has original jurisdiction under 28 U.S.C. § 1338(a).

**10.**    Twilio is subject to personal jurisdiction in the State of California and of this Court.

**11.**    Twilio is responsible for acts of infringement occurring in the Central District of California.  For example, as alleged herein, Twilio has delivered or caused to be delivered infringing products or services in the Central District of California, has induced persons in this district to infringe TeleSign's patent, is doing business in this district, recruits personnel from this district, employs employees from this district, seeks to employ persons from this district, advertises and markets its products and services in this district, seeks to sell its products and services to residents of this district (including via its website at www.twilio.com), and hosts seminars or shows in this district.

**12.**    Twilio did not contest personal jurisdiction in *TeleSign I* or in its motion-to-dismiss in this case (ECF No. 34).

**13.**    Venue is proper in this Court under 28 U.S.C. §§ 1400(b), 1391(b) and 1391(c).

**14.**    At least because Twilio is subject to personal jurisdiction in this district, it is considered to be a resident of this district; thus, venue is proper in this Court under 28 U.S.C. §§ 1400(b), 1391(b) and 1391(c).

**15.**    TeleSign is headquartered in the Central District of California, where substantial harm from Twilio's infringement has been and is being felt.

**16.**    In *TeleSign I*, Twilio moved to transfer the case, but this Court found that venue was proper.  *See TeleSign I*, ECF No. 75, pp. 4-7 (Order Denying Defendant's

3

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Motions to Dismiss).

## IV. U.S. Patent No. 9,300,792

**17.** United States Patent No. 9,300,792 (the "'792 Patent" or the "Asserted Patent") is entitled "Registration, Verification and Notification System." A true and accurate copy of the '792 Patent is attached as Exhibit 1.

**18.** The '792 Patent issued just after 12:00 AM ET on March 29, 2016, from U.S. Patent Application Serial No. 14/678,815 (the "'815 Application").

**19.** The '815 Application had published as United States Publ. No. 2015/0215889 (the "'889 Publication") on July 30, 2015. A true and accurate copy of the '889 Publication is attached as Exhibit 2.

**20.** TeleSign owns the right, title, and interest in the '815 Application, the '889 Publication, and the '792 Patent, with full rights to pursue recovery of royalties or damages for infringement of the '792 Patent, including full rights to recover past and future damages.

**21.** Each claim of the '792 Patent is presumed valid and enforceable.

**22.** Each claim of the '792 Patent is valid and enforceable.

**23.** U.S. Patent Nos. 8,462,920 and 8,687,038 (asserted in *TeleSign I*) are referred to herein as "Parent Patents" to the '792 Patent.

**24.** In *TeleSign 1*, Twilio moved on the pleadings to find the Parent Patents invalid under 35 U.S.C. § 101 as purportedly directed to patent-ineligible subject matter. This Court denied that motion, finding that at least claim-construction was necessary. *TeleSign I*, ECF No. 123. TeleSign disclosed a copy of Twilio's Section 101 motion to the Patent Office before it granted that '792 Patent.

**25.** As indicated by Exhibit 5, the Patent Office considered Twilio's Section 101 motion but still allowed the Application—as shown in Exhibit 3—and granted the '792 Patent.

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

**26.**    The Patent Office granted the '792 Patent well after the Supreme Court decided *Alice* on June 19, 2014. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014).

**27.**    The claims of the '792 Patent do not recite a mathematical algorithm.

**28.**    The claims of the '792 Patent do not recite merely a fundamental economic or longstanding commercial practice.

**29.**    The recited implementation by a computing system is integral to the claimed invention.

**30.**    The claimed solution in the '792 Patent is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks.

**31.**    Adhering to the routine, conventional functioning of the prior art would foster problems that the '792 Patent prevents.

**32.**    The '792 Patent does not broadly and generically claim 'use of the Internet' to perform an abstract business practice.

**33.**    The '792 Patent describes a technical problem to a technical solution.  For example, claims 1 and 10 address the technical problem of proliferating fake or fraudulent website/online registrations.  Fake online registrations create enormous problems for companies.  They can give a false sense of the number of users (real users) that are registered with a company.  They can tax a company's technical resources (needing more resources to service accounts that are not actually legitimate accounts).  Some websites are besieged with hundreds of thousands, or potentially millions, of attempts per day to create fraudulent registrations.  As the popularity of the Internet rose, it became increasingly popular to require users to register at websites to obtain information from the website, order goods through the website, etc.  When doing business on the Internet, potential registrants often attempt to register with untraceable or false e-mail addresses and phone numbers, which can "compromise the

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

intended purpose of the registration, create a breach of security and constitute fraud on the web-site owners." '792 Patent at 1:58-60.  And as customers seek to register with a website, they expect to be able to register immediately.  Moreover, even after a registration occurs, the problem of potential fraud exists.

34.    The technical solution of the claimed invention is to provide, among other things, verification "in real-time," providing an additional layer of security, and thereby reducing fraud.  '792 Patent at 8:45-47.  A human being, or manual process, or paper-and-pencil process would not address the technical problem and would be too slow to accommodate users' and companies' expectations for being able to timely register online.  Further, the technical solution includes receiving a user's phone number in a computing system by way of a user interface such as a website, which accommodates the anonymity of the Internet.  The system provides for the immediate sending of a verification code to a user and requires that a user-provided phone number be verified, which occurs by receiving from the user a code that should be the same as the one sent.  Again, geographical barriers are broken and the modern demand for Internet-based interactions is accommodated as the user's code is received via the computing interface.  Registration is completed based on the received code, arming a company with more knowledge about the reliability of the received user information.  The technical solution also addresses the technical problem of online fraud.  For example, the system maintains a set of notification events.  If an established notification event occurs, a user is notified.  Although some systems allow users to provide—at the time that a confirmation message is to be sent—contact information (such as an unverified phone number), the claimed invention sends a message to the formerly verified phone number.  The system then receives an acknowledgement of an act associated with the established notification event.

35.    As explained in greater detail below, Twilio provides products and services that do the same thing and actively encourages others to make, use, sell, offer for sale

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

and/or import infringing products and services, including by using Twilio's products and services.

**36.** Before the earliest effective filing date of the '792 Patent, the claimed technology was not available to customers.

**37.** In the 2005 or 2006 timeframe, it was neither conventional nor routine to receive a user's telephone number through a computing interface, send a verification code via SMS (Short Message Service) to the user, receive a submitted verification through the computing interface, verify the telephone number, complete a registration based on the received information and the verified telephone number, maintain a record of notification events associated with actions that require acknowledgement by a user, transmit a message to the telephone number upon receiving an indication of an occurrence of an established notification event, and receive from the user an acknowledgement of an action associated with the established notification event, nor was it known or obvious to do this as claimed in the '792 Patent.

## V. The Asserted Claims.

**38.** The "Asserted Claims" are claims 1, 6, 9, 10, 15, and 18.

## VI. TeleSign and Twilio are Competitors.

**39.** Twilio offers products and services that are similar to TeleSign's products and services.

**40.** TeleSign and Twilio both offer two-factor-authentication technology, notification technology to let users know of potentially fraudulent activity, and technology to help prevent fraudulent website registrations.

**41.** Twilio and TeleSign directly compete for customers and potential customers.

**42.** For example, in 2015, Twilio began increasing publicity of its phone verification services (e.g., its "Lookup" product) in direct competition with TeleSign.

**43.** TeleSign and Twilio market their products using the same channels.

7

**44.**   TeleSign and Twilio regularly meet or interact with the same customers and potential customers on sales calls and during in-person meetings.

**45.**   Customers have compared and considered using TeleSign and Twilio to provide services they need.

**46.**   Twilio has told users it was developing technology intended to provide the same features as TeleSign's technology.

**47.**   Users have compared prices of TeleSign's technology to prices of Twilio's technology.

**48.**   TeleSign has suffered price erosion, lost customers, lost goodwill and other harm due to Twilio's infringement of the '792 Patent.

**49.**   Media reports and third parties consider Twilio and TeleSign as competitors and providers of similar technologies, such as SMS technology and two-factor-authentication technology.

**50.**   Users consider Twilio and TeleSign as competitors.

**51.**   Twilio seeks to take customers from TeleSign.

**52.**   TeleSign sought a preliminary injunction in *TeleSign I* due to harm caused by Twilio's infringement of U.S. Patent No. 7,945,034.  *See* TeleSign I, ECF No. 23.

**VII.   Twilio's Prior Knowledge of the '792 Patent and Its Claims.**

**53.**   Through its counsel, Twilio received actual notice of the '792 Patent by March 29, 2016.  The original complaint (ECF No. 1) in this action was filed on March 28, 2016 (Eastern Time), and a copy was sent by email to counsel for Twilio on March 29, 2016.  Counsel for Twilio responded to that email on March 29, 2016.

**54.**   A copy of the original complaint was duly served on Twilio on March 31, 2016. ECF No. 13.

**55.**   Twilio received a copy of TeleSign's original complaint in *TeleSign I* on or about April 30, 2015.  TeleSign I, ECF No. 79 at ¶ 29.

**56.**   Twilio became aware of TeleSign's '920, '038, and '034 patents on April 30,

8

2015, when it was served with the Complaint in *TeleSign I*, which asserted infringement of the patents.

**57.**     On information and belief, Twilio became aware of the '815 Application—it being a child of the '920 and '038 patents—as part of its diligence in defending against TeleSign's allegations in *TeleSign I*.

**58.**     Twilio received a copy of the then pending and published claims when TeleSign filed them as exhibits to *TeleSign I* motion on February 22, 2016.  *See* Exhibit 4.

**59.**     TeleSign also filed documents in *TeleSign I* showing that TeleSign's '792 Patent was granted after the Patent Office considered (i) Twilio's Motion for Judgment on the Pleadings and (ii) Twilio's *inter partes* review requests for the Parent Patents (and other submitted references).  *See* Exhibits 3 and 5.

**60.**     TeleSign provided the prosecution history of the '815 Application to Twilio on March 8, 2016, including the pending claims and the Notice of Publication from the Patent and Trademark Office stating that the application was published as Publ. No. 2015/0215889.  *See* Exhibit 6.

**61.**     As part of TeleSign's document production in *TeleSign I*, Twilio received a copy of the Notice of Publication regarding the '889 Publication and a copy of the Notice of Allowance that indicated that the claims of the '815 Application (which would be the same as those in the '792 Patent) would be allowed.

**62.**     The claims of the '792 Patent did not change during prosecution of the '815 Application.

**63.**     The claims in the '889 Publication (Exhibit 2), published on July 30, 2015, are identical (or substantially identical) to the issued claims in Patent No. 9,300,792 (*see* Exhibits 1 and 2).

**64.**     Thus, Twilio had actual notice of TeleSign's '815 Application and of the '889 Publication as of March 8, 2016.  Twilio has and has had actual notice of the '815

9

Application, the '889 Publication, and the '792 Patent before the filing of this First Amended Complaint.

**65.** In summary, after Twilio received the *TeleSign I* complaint, on information and believe, it analyzed the patents family, learned of the Parent Patents, learned of the '815 Application (and its filed claims) and of the '889 Publication, and monitored the '815 Application's examination process by the Patent Office, including the Notice of Allowance (Exhibit 3)—which would have confirmed that the claims allowed were the same as the claims as filed and that would issue.  Twilio also learned of the Issue Notification prior to the '792 Patent's issuance, which would have given Twilio notice that the '792 Patent would issue on March 29, 2016.

**66.** Twilio's prior knowledge—including its pre-issuance knowledge—is relevant to, among other things, TeleSign's willfulness claims and its demand for damages under 35 U.S.C. § 154(d).

## VIII.   COUNT I – Direct Infringement
### Twilio Directly Infringes the '792 Patent Under 35 U.S.C. § 271(a).

**67.** All of the preceding paragraphs are incorporated by reference herein.

**68.** TeleSign alleges two independent direct-infringement bases in view of two of Twilio's offerings:  1) Authy and 2) Twilio's 2FA protection for Twilio's customer accounts hereinafter ("Twilio Account Protection") (each described below).

**69.** Twilio has directly infringed, continues to directly infringe, and—unless enjoined—will continue to infringe the Asserted Claims of the '792 Patent by making, using, selling, offering for sale and/or importing Authy.

**70.** Authy includes computer-executable instructions for performing (and does perform) each element recited in the Asserted Claims of the '792 Patent.

**71.** Twilio has directly infringed, continues to directly infringe, and—unless enjoined—with continue to infringe the Asserted Claims of the '792 Patent by making, using, selling, offering for sale and/or importing Twilio Account Protection.

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

**72.**    Twilio Account Protection includes computer-executable instructions for performing (and does perform) each element of recited in Asserted Claims.

**73.**    As a result of Twilio's infringement of the '792 Patent, TeleSign has suffered injury and monetary damages for which TeleSign is entitled to relief in the form of damages for lost profits and in no event less than a reasonable royalty to compensate for Twilio's infringement.

**74.**    Twilio has knowingly, willfully, and deliberately infringed the '792 Patent in conscious disregard of TeleSign' rights, making this case exceptional within the meaning of 35 U.S.C. § 285 and justifying treble damages pursuant to 35 U.S.C. § 284.  Among other things, as explained here, Twilio had pre-issuance notice of the scope of the claims that would issue in the '792 Patent—but still continued to carry out the acts described herein.  For example, other courts have held that advance notice of the scope of patent claims, by way of notice letters regarding a pending application, can be relevant to the knowledge aspect of a willfulness inquiry.

**75.**    Twilio has demonstrated that it will continue to infringe the '792 Patent, causing immediate and irreparable harm to TeleSign unless this Court enjoins and restrains Twilio's activities.

**76.**    The infringement of the '792 Patent by Twilio has, and will, deprive TeleSign of sales, licensing fees, royalties and other related revenue which TeleSign would have made or would enjoy in the future and will cause TeleSign added injury and damage unless Twilio is enjoined from infringing the '792 Patent until the expiration of the '792 Patent.

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

### VIII(A). Authy

**77.** Authy is an online security solution provided by Twilio.[2] Twilio explains that Authy "is trusted by over 10,000 websites and mobile apps," and includes the following screen shot on its website.[3]



**78.** As Twilio has explained in its SEC filings, Authy has been integrated into Twilio ("With the integration of Authy, we now provide a cloud-based API to seamlessly embed two-factor authentication and phone verification into any application.").[4]

**79.** The full and precise contours of that technical and business integration are not public.

---

[2] "Authy" was the name of a company Twilio acquired. That company's main product was also marketed as "Authy."

[3] https://www.twilio.com/authy, last visited Aug 19, 2016.

[4] https://www.sec.gov/Archives/edgar/data/1447669/000104746916013448/a2227414zs-1.htm (last visited Aug 19, 2016).

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

**80.**    Authy uses a REST API.[5]  As used herein, "Authy API" refers to that REST API and includes what Twilio refers to as the TOTP API, Phone Verification API, and Authy OneTouch API.

**81.**    Twilio describes Authy as an online security solution using two-factor authentication.  Authy is said to provide a back-end infrastructure for two-factor authentication.  Twilio has described Authy as the largest two-factor authentication platform.

**82.**    There were purportedly over one million unique Authy users by August 2014.

**83.**    Authy infringes the Asserted Claims of the '792 Patent.  Authy includes executable instructions to perform and does perform a verification and notification method as claimed.

**84.**    With reference to the Asserted Claims, Authy receives information from a user, such as the user's telephone number (e.g., mobile phone number) via a computing interface.  Illustrative computing interfaces include a website presented to the user, a mobile app (such as the Authy Mobile App), or the Authy API (including, for example, the TOTP API).

**85.**    This computing interface is presented when a user attempts to access a service, such as a customer's protected application (including one built using an Authy SDK), a protected portion of a customer's website, or when a user attempts to access Authy itself (being a service available to protect registered users).

**86.**    Authy verifies the user's telephone number by sending a verification code via SMS to the user's telephone number (or equivalent).  For example, Authy facilitates texting the user a code that is used as a verification code (e.g., Authy OneCode).  Authy also communicates verification codes to users via phone calls to the user's phone.  Authy can also request verification via user devices such as iPads, Android

---

[5] https://docs.authy.com/totp.html ("Authy uses a REST API. The API is designed to use HTTP response codes to indicate status. The body of the response will also include more information.") (last visited August 30, 2016).

13

**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

devices, and PCs via apps installed on those devices and associated with the user (e.g., by way of the user's phone number).

**87.**    Authy receives a response from the user via the aforementioned computing interface (e.g., website, a mobile app, an interface utilizing an Authy API).  The response—a submitted verification code—is a response to the verification code Authy sent.

**88.**    Authy verifies the telephone number, checking whether the user-submitted verification code is the same as the verification code that Authy sent.  If it is, Authy will consider the telephone number verified and will complete the registration of the user based on the received and verified telephone number.  For example, Authy will store at least some of the information (e.g., the telephone number) if the user-submitted code matches the code Authy sent.  By way of further example, Authy also stores an indication allowing SMS token verification using the verified telephone number to be enabled for the user's Authy account if a match occurs and the received telephone number was able to be verified.  This completed registration allows a user to access the functionality of Authy (be able to use it).

**89.**    Authy maintains records of one or more notification events associated with actions that require acknowledgement by the user.  For example, Authy stores user activities (e.g., "password_reset"), application stats (e.g., "sms_count"), and actions (e.g., "action=login&action_message='Login code'").  On information and belief, Authy facilitates the storage of other records of notification events, which may be established by Authy or Twilio's customer, for instance, and can include improper login attempts, attempts to change one's password, and attempts to reset or change one's phone.

**90.**    When Authy receives an indication that a notification event occurs, it notifies the user and receives acknowledgement.  When Authy receives an indication of an event, Authy sends an SMS message to the verified telephone number, and then

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

receives a user response.  For example, when Authy receives an indication of an improper login attempt (or other notification event), Authy sends a text message to provide notification to the user.

91.    Authy can also facilitate sending messages to user devices such as iPads, Android devices, and PCs via apps installed on those devices (e.g., via Authy OneTouch) and associated with the user (e.g., by way of the user's phone number).

92.    Authy then receives a user acknowledgement, directly from the user, or by way of the Authy API (e.g., to verify the user's token).  For example, Authy receives an indication from the user that the established event is legitimate.

### VIII(B).  Twilio Account Protection.

93.    Twilio makes, uses, sells, offers for sale, and/or imports a set of computer executable instructions for performing (and Twilio does perform) a method to protect user accounts using, among other things, two-factor authentication and to notify users of the occurrence of notification events, which is herein referred to as "Twilio Account Protection."  Twilio uses this process and the executable instructions itself (e.g., "in house"); thus the instructions and the methods are not associated with a customer-facing product name in the same way Authy is.  Even so, aspects of Twilio Account Protection are described on Twilio's website (as shown below) on a page entitled "Enabling two factor authentication on your Twilio account," which explains how a user can enable 2FA on an account and how—once enabled—users will be asked to be verified.[6]

---

[6] https://support.twilio.com/hc/en-us/articles/223136307-Enabling-two-factor-authentication-on-your-Twilio-account, last visited August 26, 2016 (Exhibit 7).

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17   **94.**    Twilio Account Protection employs two-factor authentication and provides for

18   users to be notified of the occurrence of notification events.  For example, Twilio uses

19   Twilio Account Protection to control access to Twilio's products and services via, for

20   example, the Twilio Console and the Authy Dashboard, including controlling access

21   to restricted portions of Twilio's website using pages and executable code from

22   https://www.twilio.com/login, https://dashboard.authy.com/signin and beyond

23   https://www.twilio.com/try-twilio).  Included as part of Twilio Account Protection are

24   computer-executable instructions to notify (and that results in notifying) users via

25   their verified phone numbers when an attempt is made to access their Twilio Accounts

26   (e.g., when users or when fraudsters attempt to proceed pass Twilio's login screens).

27   For trial accounts, using two-factor authentication is mandatory.

28

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

**95.**    With reference to the Asserted Claims, in addition to the allegations above, Twilio Account Protection includes executable instructions to perform and does perform a verification and notification method as claimed.

**96.**    Twilio Account Protection receives information from a user, such as the user's email address, password, and telephone number (e.g., a mobile phone number), via a computing interface such as Twilio's website presented to the user.

**97.**    This computing interface is presented when a user attempts to register with Twilio and to access restricted portions of Twilio's website (e.g., past the login screens at https://www.twilio.com/login and https://dashboard.authy.com/signin) and/or https://www.twilio.com/try-twilio) or when a user attempts to enable 2FA account protection on an existing account.  For example, in the screenshot below, user information (name, email, products of interest, applications of interest, programming language, etc.) is received as a user attempts to register with Twilio.[7]



**98.**    Twilio Account Protection verifies the user's telephone number by sending a verification code via SMS to the user's telephone number.  For example, Twilio Account Protection texts the user a code that is used as a verification code.  Twilio

---

[7] https://www.twilio.com/try-twilio (last visited Aug 26, 2016) (Exhibit 8).

17

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Account Protection also communicates verification codes to users via phone calls to the user's phone.

**99.**    As illustratively shown below—after a user provides the information from the former sign-up screen, Twilio requests a phone number and indicates that the phone number "will be used for authentication" when logging into Twilio's website.  This is shown in the screenshot below.[8]



**100.**    Twilio Account Protection then sends a code to the potential registrant.  This is illustrated below.[9]



**101.**    Twilio Account Protection receives a response from the user via the aforementioned computing interface (e.g., the Twilio website).  The response—a submitted verification code—is a response to the verification code Twilio Account Protection sent.

**102.**    Twilio Account Protection verifies the telephone number by checking whether the user-submitted verification code is the same as the verification code that Twilio

---

[8] https://www.twilio.com/signup/verify (last visited Aug 26, 2016) (Exhibit 9).
[9] https://www.twilio.com/signup/verify (last visited Aug 26, 2016) (Exhibit 10).

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Account Protection sent.  If it is, Twilio Account Protection will consider the telephone number verified and will complete a registration of the user based on the received and verified telephone number. For example, Twilio Account Protection will store at least some of the information (e.g., name, address, telephone number) if the user-submitted code matches the code that Twilio Account Protection sent.  By way of further example, Twilio Account Protection also stores an indication enabling 2FA account protection using the verified telephone number for the user's Twilio account if a match occurs and the received telephone number was able to be verified.

**103.**    As used herein, the term "Twilio Account Protection" also includes Twilio's executable code for maintaining records (which Twilio does maintain) of one or more notification events associated with actions that require acknowledgement by the user. For example, Twilio Account Protection facilitates the storage of information regarding login attempts, including login attempts from untrusted computers, information regarding attempts to change one's verified phone number, and when a certain number of days have lapsed.  The occurrence of those events leads to users being notified.

**104.**    When Twilio Account Protection receives an indication that a notification event, e.g., established by Twilio or the user, has occurred, it notifies the user and receives acknowledgement, such as by sending a message to the user's verified telephone number.  For example, when Twilio Account Protection receives an indication that a customer is logging in from an untrusted computer (or other notification event), Twilio Account Protection sends a text message to provide notification to the user.

**105.**    Twilio Account Protection can also facilitate sending messages to user devices such as iPads, Android devices, and PCs via apps installed on those devices and associated with the user (e.g., by way of the user's phone number).

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

**106.**    Twilio Account Protection then receives a user acknowledgement from the user (e.g., by way of the Twilio website).  For example, Twilio Account Protection receives an indication from the user that the occurrence of the established notification event is (or is not) authorized or expected.

## IX. COUNT II – Indirect Infringement
### Twilio Induces Infringement of the '792 Patent Under 35 U.S.C. § 271(b).

**107.**    All of the preceding paragraphs are incorporated by reference herein.

**108.**    Twilio's products and services include "software for voice, messaging, video and authentication that empowers developers to build applications that can communicate with connected devices globally."[10]  An aspect of Twilio's business model is to not always provide a complete business solution, but to have users make and use, or sell, offer for sale or import, its products to do so.  For example, Twilio explains: "our Programmable Communications Cloud offers flexible building blocks that enable our customers to build what they need."[11]

**109.**    These "building blocks" include the Twilio REST API (referred also to as the "REST API" "Twilio API" or the "cloud API"[12]), including Twilio Messages,[13] Twilio SMS,[14] Twilio Messaging Copilot, Twilio Short Codes, Twilio Calls,[15] Twilio Voice,[16] Twilio Notify ("Notify"), "Use Case APIs," and TwiML, ,  and supporting SDKs. The "Use Case APIs" are for specific purposes, such as to have its customers

---

[10]
https://www.sec.gov/Archives/edgar/data/1447669/000104746916013448/a2227414zs-1.htm (last accessed August 19, 2016).
[11]
https://www.sec.gov/Archives/edgar/data/1447669/000104746916013448/a2227414zs-1.htm (last accessed August 19, 2016).
[12] As attested to by a Twilio representative, Twilio claims that it "shares its groundbreaking cloud application programming interface ("API") with the world so that software developers around the globe can build new and complex communication systems." *TeleSign I*, ECF No. 55-1 at ¶ 3.
[13] On information and belief, a replacement to what Twilio formerly referred to as "Twilio SMS."
[14] On information and belief, now known as, or succeeded by, "Twilio Messages."
[15] On information and belief, a replacement to what Twilio formerly referred to as "Twilio Voice."
[16] On information and belief, now known as, or succeeded by, "Twilio Calls."

20

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

implement two-factor authentication and notification services to customers.  For example, Twilio explains the following in its SEC Filings:  "Use Case APIs.  While developers can build a broad range of applications on our platform, certain use cases are more common. Our Use Case APIs build upon the above products to offer more fully implemented functionality for a specific purpose, **such as two-factor authentication**, thereby saving developers significant time in building their applications."[17]

**110.**   With knowledge of the '792 Patent, Twilio encourages and instructs users to create and use infringing two-factor authentication and notification solutions using Authy and Twilio's REST API along with other building blocks, as explained in greater detail below.  Twilio provides Authy and its REST API to its customers and encourages their use, knowing, or willfully blind to the fact, that the induced acts (customers making and using authentication, verification, and notification applications for example) constitute infringement of the Asserted Claims of the '792 Patent.

**111.**   Twilio induces its customers to make, use, sell, offer for sale and/or import products (such as applications[18]) that include instructions to perform and services that do perform the notification and verification method recited in the Asserted Claims.

**112.**   Twilio provides the parts for its customers to make, use, sell, offer for sale or import infringing products, and shows them how to and actively encourages them to do so.  By analogy, if TeleSign's patent covered a car, then Twilio provides parts to customers to make and use the claimed car, and provides tutorials on how to make and use such a car and actively encourages customers to do so, particularly, in an

---

[17] https://www.sec.gov/Archives/edgar/data/1447669/000104746916013448/a2227414zs-1.htm (last accessed August 27, 2016) (emphasis added).

[18] Generally, references herein to "applications" (such as customer applications that Twilio's customers develop, or Twilio's applications, or applications that users use, and the like) are references to executable instructions embodied on computer-readable storage media.

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

infringing manner.  Here, the parts of the car correspond to Twilio's self-described building blocks, modules of computer-executable code, as identified above.

**113.**    Thus, given that Twilio provides technical support regarding, sells, offers, advertises, encourages, teaches, and actively instructs customers how to use Authy and the REST API to perform a verification and notification method, Twilio's knows that its customers' acts (following Twilio's guidance) constitute infringement of the '792 Patent—and to the extent Twilio might argue that it lacks such knowledge, that would be because Twilio willfully blinded itself to that fact.

**114.**    Twilio has knowingly induced its customers' infringement and possessed specific intent to encourage their infringement since the service of the original Complaint in this action (ECF No. 1) and since the filing of this First Amended Complaint.  For example, Twilio has allowed its tutorials, encouragements, and instructions to continue after service of the original complaint, at least by way of the same appearing on its website.  On information and belief, Twilio's sales force, marketing force, evangelists, and other company representatives have and continued to actively encourage Twilio's customers to use Authy and the REST API to make, use, offer, sell or import infringing verification and notification methods and applications.

### IX(A).    Twilio's Knowledge.

**115.**    All of the preceding paragraphs are incorporated by reference herein (including those of Section VII).

**116.**    As indicated in Section VII, Twilio has known of the '792 Patent at least by service of Original Complaint (March 31, 2016), which expressly put Twilio on notice of the '792 patent.

**117.**    Twilio has induced customers to infringe the '792 Patent at least since March 31, 2016.

**118.**    Twilio has known at least since March 31, 2016 that the acts described herein,

22
FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

which Twilio has been and is inducing, constitute infringement of the '792 Patent (including, as applicable, Twilio being willfully blind to such fact).

## IX(B).     Underlying Direct Infringement.

**119.**   First theory:  Twilio's customers directly infringe claims 10, 15, and 18 of the '792 Patent as "single actors" when they make, use, sell, offer for sale, and/or import applications that infringe at least claims 10, 15, and 18 using Authy.

**120.**   Second theory:  Twilio's customers directly infringe the Asserted Claims of the '792 Patent as "single actors" when they make, use, sell, offer for sale, and/or import products and services that infringe the Asserted Claims using Twilio's REST API.

**121.**   Third theory:  Twilio and its customers directly infringe the '792 Patent by making, using, selling, offering for sale, and/or importing products and services that infringe the Asserted Claims using Authy and Twilio's REST API, with all steps being attributable to Twilio's customers (in the word used in certain case law, Twilio's customers are the "mastermind" under this theory).

**First Theory of Underlying Direct Infringement:  Twilio's customers directly infringe claims 10, 15, and 18.**

**122.**   Twilio has, under 35 U.S.C. § 271(b), indirectly infringed, and continues to indirectly infringe 10, 15, and 18 by, *inter alia*, supporting, instructing (e.g., via tutorials and marketing materials), and encouraging Twilio's customers (including developers) to make, use, sell, offer for sale, and/or import applications that carry out the steps of claims 10, 15, and 18 and to use Twilio-provided executable instructions (such as the Authy API) to access Authy.

**123.**   Following Twilio's instructions (as, for example, explained in the "Specific Intent" section below), Twilio's customers do make such make, use, sell, offer for sale, and/or import such applications, which infringe claims 10, 15, and 18.  For example, Twilio customers embed the functionality of Authy (e.g., via the Authy API)

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

in new and existing applications, and customers include the ability to use Authy in infringing applications as recommended by Twilio.

**124.** For example, with reference to claims 10, 15, and 18, following Twilio's instructions, a customer's application receives information from its user when that user wants to access a restricted portion of the customer's website. The received information includes, for example, the user's telephone number (e.g., mobile phone number) and is received by way of a computing interface such as an online web form (e.g., the customer's website). Following Twilio's instructions, the customer application verifies the received telephone number. Twilio recommends and encourages doing this by using the Authy API. At least some customers follow Twilio's advice and build applications that use the Authy API to verify the received phone number, which includes sending a verification code via SMS to the user's telephone number. Twilio explains to users that the verification code can also be sent to the user by way of a phone call, for instance, to the user's telephone, and some customer applications do this.

**125.** Following Twilio's instructions, the customer application receives a response (an end-user submitted verification code) that was entered by a user using the customer's online form. Following Twilio's instructions, the customer application considers the telephone number verified and associates the telephone number with data indicating such if the user-submitted verification code is the same as the verification code that was sent to the user's telephone number (e.g., when the Authy API call returns a "success"). If verified, the customer application completes a registration of the customer's user based on the received and verified telephone number, and allows, for instance, access to the restricted portion of the customer's website, logins to be attempted, or login verifications using the verified telephone number to be enabled for the user's account.

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

**126.**   Given Twilio's instructions, the customer application provides for the maintaining of a record of one or more notification events associated with actions that require acknowledgement by the customer's user.  For instance, records are maintained indicating that a customer's user is to be notified upon a threshold number of failed login attempts or logging in from an untrusted computer.  Records are also maintained on users having two-factor authentication enabled at login or, for instance, users resetting passwords.  The customer application maintains the records locally or remotely, including with Twilio.

**127.**   When the customer application receives an indication that an established notification event occurred (e.g., an event established by the customer or the customer's user), it sends a message to its customer.  Following Twilio's instructions, this message can be sent using Authy, Twilio Messages, Twilio Call, or Notify to the verified telephone number.

**128.**   The customer application receives a user acknowledgement of the action, such as a response that indicates that the action was legitimate (or not).

**Second Theory of Underlying Direct Infringement:  Twilio's customers directly infringe the Asserted Claims in view of Twilio's REST API.**

**129.**   Twilio has, under 35 U.S.C. § 271(b), indirectly infringed, and continues to indirectly infringe the Asserted Claims by, *inter alia*, supporting, instructing (e.g., via tutorials and marketing materials), and encouraging Twilio's customers (including developers) to make, use, sell, offer for sale, and/or import applications that carry out the steps of the Asserted Claims using Twilio's REST API.  And given Twilio's instruction, at least some of Twilio's customer carry out the same and use those applications in an infringing manner.

**130.**   Following Twilio's instructions (as, for example, explained in the "Specific Intent" section below), with reference to the Asserted Claims, Twilio's customers receive information from a user, such as the user's telephone number (e.g. mobile

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

phone number), by way of an online web form (such as the customer's website) when attempting to access a protected customer's service (such as a restricted potion of the customer's website).

**131.**    Following Twilio's instructions, Twilio's customers verify the user's telephone number by sending a verification code using the REST API via SMS to the user's telephone number, such as by using Twilio Messages.[19]  Twilio customers may also send verification codes using Twilio Call.[20]  Twilio's customer receives a submitted verification code that was provided by its user via the customer's online form.

**132.**    Twilio's customer compares the two codes and considers the telephone number verified if the user-submitted code is the same as the verification code that was sent to the user's telephone number. Twilio recommends and encourages doing this, for instance, via ASP.net tools or generating and comparing verification codes within the customer's application.  If verified, Twilio's customer completes a registration of the user based on the received information and the verified telephone number, for instance, by storing the information and verified phone number in association with the user's account or by enabling login verifications using the verified telephone number for the user's account.

**133.**    Twilio's customer maintains a record of one or more notification events associated with actions that require acknowledgement by the user.  For instance, the customer maintains records regarding when users are to be notified given a threshold number of login attempts, duration to reset passwords, when a user should confirm identifying info when logging in from an untrusted computer, or which users have two-factor authentication enabled at login.

**134.**    When such a notification event occurs (e.g., as established by the customer or the customer's user), Twilio's customer notifies its customer of the event.  The Twilio

---

[19] Upon information and belief, formerly known as Twilio SMS.
[20] Upon information and belief, formerly known as Twilio Voice.

26

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

customer uses Twilio Notify or the REST API (e.g., via Twilio Messages) to send a message to the verified telephone number.

**135.** Twilio's customer receives a user acknowledgement from the user via the customer's web form, for instance a user attempting to successfully enter a validation code that she has received or otherwise indicating that the attempted action was legitimate (or not).

**Third Theory of Underlying Direct Infringement:
Joint Infringement by Twilio and its customers using
Authy and Twilio's REST API.**

**136.** In some cases, the underlying direct infringement by Twilio's customers includes joint infringement, where the performance of the patented technology is attributable to Twilio's customers, performed at their direction and control, even when certain steps are carried by Twilio.

**137.** By way of example, the Twilio customer receives information including an end user's phone number (e.g., mobile phone number) via the customer's website or app.

**138.** The Twilio customer—at the instruction and encouragement of Twilio—passes the phone number to Twilio, such as via the Authy API. Twilio, such as via Authy, sends a text to the received phone number, receives a response (which is passed to Authy by the customer via the Authy API when the customer's end user enters the response via the customer's website), and Authy verifies the telephone number (e.g., the number is considered verified when the sent and received codes match).

**139.** The customer completes a registration of the customer's user based on Twilio's verification, and allows, for instance, access to the restricted portion of the customer's website, logins to be attempted, or login verifications to be enabled for the user's account.

**140.** The customer maintains a record of one or more notification events associated with actions that require acknowledgement by the customer's user. For instance, records are maintained indicating that a customer's user is to be notified upon a

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

threshold number of failed login attempts or logging in from an untrusted computer. Records are also maintained on users having two-factor authentication enabled at login or, for instance, users resetting passwords. The customer maintains the records locally or remotely, including with Twilio.

**141.** When the customer receives an indication that an established notification event occurred (e.g., an event established by the customer or the customer's user), it sends a message to its customer. This message is sent using Authy, Twilio Messages, Twilio Call, or Notify to the verified telephone number. The customer then receives a user acknowledgement of the action, such as a response that indicates that the action was legitimate (or not).

**142.** In these cases, the use of the claimed technology is attributable to Twilio's customers because they opt (at the instruction, encouragement, and advice of Twilio) to verify their own customers' telephone numbers, but use Twilio to do so (e.g, by using Authy to verify the end user's phone number).

**143.** Twilio acts at the direction and control of its customers.

**144.** By way of agreements and representations, Twilio commits to providing its services to such customers and making Twilio's services available to them such that Twilio cannot unilaterally refuse to provide its products or services.

**145.** Twilio obligates itself to provide its products and services to its customers, including the REST API, and Twilio agrees to provide service credits in exchange for failing to meet its obligations and commitments to its customers.

**146.** Twilio has an API Service Level Agreement with its customers that obligates Twilio to make its REST API available, essentially, all the time.

**147.** For example, Twilio's Service Level Agreement (Exhibit 12) promises customers that Twilio will provide its services, thus performing steps at the direction and control of Twilio's Customers. Twilio promises that its API will be available, including promising to its customers that the Twilio API will be available 99.95% of

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

the time in a month.  If Twilio fails, its customers receive a remedy.  Twilio claims that it continues to maintain a 99.999% uptime rate for Authy.

**148.**    Twilio promises to provide written notice prior to terminating or suspending its services to customers.

**149.**    Twilio encourages its customers to perform infringing steps (such as phone-number verification), and Twilio will not decline to perform actions that it recommends its users undertake.

**150.**    Twilio requires its customers to indemnify Twilio for claims or liability in connection with the customer applications, indicating that the activity is attributable to Twilio's customers.

**151.**    The total and collective terms of the Service Level Agreement and the Terms of Service show that Twilio is operating at the direction and control of customers that decide to use its REST API.

**152.**    Twilio's customers indemnify Twilio from potential harm stemming from intellectual-property claims.

**153.**    Twilio's agreements with its customers protect Twilio from any intellectual-property issues that arise from the customers' use of Twilio's services.  *See* Exhibit 13.

**154.**    Twilio's customers agree to defend, indemnify and hold Twilio and its affiliates harmless against any actual or threatened claim, loss, liability, proceeding, third-party discovery demand, governmental investigation or enforcement action arising out of or relating customers' activities under Twilio's terms of service or customers' acts or omissions in connection with the provision of customers' applications, including, without limitation, any intellectual property claims relating to customers' applications, as shown below:

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

**12. Indemnification**

You will defend, indemnify and hold Twilio and its affiliates harmless against any actual or threatened claim, loss, liability, proceeding, third-party discovery demand, governmental investigation or enforcement action arising out of or relating to your activities under these Terms or your acts or omissions in connection with the provision of Your Application, including, without limitation, any intellectual property claims relating to the Your Application and any violation by you or your End Users of the terms of Section 6 (Restrictions) ("**Claim**"). We and our affiliates will cooperate as fully as reasonably required in the defense of any Claim, at your expense. We reserve the right, at your expense, to retain separate counsel for ourselves in connection with any Claim or, if you have not responded reasonably to the applicable Claim, to assume the exclusive defense and control of any Claim in which you are a named party and that is otherwise subject to indemnification under this Section 12 (Indemnification). You will pay all costs, reasonable attorneys' fees and any settlement amounts or damages awarded against us in connection with any Claim. You will also be liable to us for any costs and attorneys' fees we incur to successfully establish or enforce our right to indemnification under this Section.

**155.** Twilio's customers' applications instruct Twilio to send text messages, including when an application has been built with or relying on Authy or Twilio's REST API or when a customer has added Authy to an application.

**156.** Twilio routes SMS messages for its customers. TeleSign I, ECF No. 55-1 at ¶ 24.

## IX(C).    Specific Intent

**157.** All of the preceding paragraphs are incorporated by reference here.

**158.** Twilio possesses specific intent to encourage its customers' direct infringement.

**159.** Twilio has known, or is willfully blind to the fact, that it has been (at least since March 31, 2016) and is encouraging acts that constitute infringement of the Asserted Claims, including inducing its customers' infringement.

**160.** In the face of the knowledge of the '792 Patent as alleged herein, Twilio continues (at least past March 31, 2016) to encourage its customers to use Authy to make, use, sell, offer to sell and import products and services that infringe the Asserted Claims (as detailed above in the underlying-direct-infringement sections) with knowledge (or willful blindness) that its induced acts (described above) constitute patent infringement.

**161.** In the face of the knowledge of the '792 Patent as alleged herein, Twilio continues (past March 31, 2016) to encourage its customers to use Twilio's REST API to make, use, sell, offer to sell and import products and services that infringe the

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Asserted Claims of the '792 Patent with knowledge (or willful blindness) that its induced acts (described above) constitute patent infringement.

**162.** Twilio continues to provide tutorials that recommend using verifying and registering techniques in combination with tutorials that recommend notifications. Twilio's customers follow such tutorials to make, use, sale, and offer infringing applications and services. An illustrative tutorial is Twilio's SMS Two-Factor Authentication Tutorial ("SMS 2FA Tutorial").[21] Twilio continues, with knowledge of the '792 Patent as described, to provide its SMS 2FA Tutorial, which actively promotes, encourages and teaches customers to build applications that carry out all of the steps of the Asserted Claims. With knowledge of the '792 Patent and its claims, Twilio has not removed or taken down the instructional SMS 2FA Tutorial (nor other tutorials and marketing encouragements described herein), thereby knowing that the customer acts Twilio is inducing constitute patent infringement.

**163.** Some tutorials independently encourage (especially as would be understood by a skilled programmer) customers to build applications that carry out all of the steps of the Asserted Claims. Other of Twilio's tutorials are targeted and interlink with each other and direct uses by cross-references (including via marketing materials that describe the functionality of Twilio's products and how they can and should be combined) that show and recommend carrying out tasks together with other tasks (such as sending SMS messages in combination with two-factor authentication during registration processes). Twilio continues to offer and link to its tutorials that instruct users to verify, notify, and register users—all with knowledge (or willful blindness) that these induced acts constitute patent infringement.

**164.** For example, Twilio lists a number of "use cases" at https://www.twilio.com/use-cases.[22] These use cases include "Two Factor

---

[21] Beginning at https://www.twilio.com/docs/tutorials/walkthrough/sms-two-factor-authentication/csharp/mvc, last accessed Aug. 28, 2016) (Exhibit 11).
[22] Last accessed Aug. 29, 2016 (Exhibit 14).

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Authentication," "Dispatch Notification" using "automated SMS" and more. Clicking on the "Two Factor Authentication" link takes a user to https://www.twilio.com/use-cases/two-factor-authentication.[23] That page encourages users to use "SMS, automated calling, or a local app to receive dynamic codes for secure login" and more. At the bottom of the page, links are provided to specific "Building Blocks," which—for two-factor authentication—include "SMS," "VOICE," "SHORT CODES," and "AUTHY."[24] Further down the page, under the "Why Twilio" section, Twilio expressly advertises an "Easy to build and use" feature, which recommends customers to "**Integrate** second-factor authentication into any login or **registration** workflow in any programming language. Customize the user experience with your design and security requirements."[25]

**165.**    Twilio's markets to technically-sophisticated persons and companies, such as developers and company IT support personnel. They would readily appreciate that, in view of Twilio's instructions and marketing, Twilio is encouraging its customers to use Twilio's building blocks to make, use, sell, offer for sale or import infringing applications, for example by instructing customers that they should add Authy or Twilio's REST API to applications, through instructions and tutorials on Twilio's website, at developer conferences, and in videos and other social media postings that continue to link to instructions and code that tell users to employ Authy and Twilio's REST API, and by posting and continuing to make available videos and tutorials that teach how to embed Authy or Twilio's REST API in applications to expose Twilio's authentication and verification techniques, with knowledge that these induced acts constitute patent infringement.

**166.**    Twilio recommends Authy and Twilio's REST API to be used—as described—to its customers, for example by recommending that its customers employ a two-factor

---

[23] Last accessed Aug. 29, 2016 (Exhibit 15).
[24] *See* Exhibit 15, pp. 142-143.
[25] *See* Exhibit 15, p. 144 (emphasis added).

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

authentication solution, and recommending that customer applications use two-factor authentication with respect to their end-user customers, and then recommending, for instance, Authy as an easy way for these customers to implement two-factor authentication.

**167.** Twilio's customers follow such instructions and recommendations, and thereby directly infringe the '792 Patent, as explained herein.

**168.** Twilio intends for developers to add Authy to their products and services. When Twilio acquired Authy, one reason was to enable Twilio's customers to build more with less code, by providing Authy for developers seeking easy to implement strong identity verification.

**169.** Twilio has claimed it is investing massively in expanding Authy's footprint with developers of all kinds, thereby specifically intending users to use Authy when do so results in infringement of the Asserted Claims.

**170.** Twilio markets to its customers to make, use, sell, offer to sell, import or otherwise benefit from Authy and Twilio's

**171.** REST API, including the benefits of exposing Twilio's backend service in applications.

**172.** Twilio recommends and encourages its customers to receive information from a user, including a telephone number associated with an end user of a customer's program or application. For example, Twilio instructs customers to learn to implement Authy and Twilio's REST API with applications, and Twilio instructs its customers to ask for a user's phone number at the point of sign-up. Twilio recommends this so that customers' applications will be more secure.

**173.** Twilio recommends and encourages its customers to verify its customer accounts using Authy and Twilio's REST API. For example, Twilio provides articles, videos and other materials and presentations to audiences that advise Twilio's

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

customers to employ two-factor authentication such as Authy and Twilio's REST API in applications.

**174.**    Twilio recommends and encourages users to use Authy and Twilio's REST API to verify and notify users of events to provide additional security, and Twilio knows or is willfully blind to the fact that these induced acts constitute patent infringement.

**175.**    Twilio instructs its customers to complete registrations based on verified telephone numbers, including instructing customers to use an Authy verification that is sent to an end user's phone.  Twilio instructs its customers to maintain records of notification events.  For example, Twilio recommends implementing Authy and Twilio's REST API at login or to confirm the person is authorized, and Twilio knew or was willfully blind to the fact that these induced acts constituted patent infringement of at least one claim of the '792 Patent.

**176.**    Twilio offers and encourages uses to use a free Authy trial account so users can use Authy.

**177.**    Twilio advertises that it has powered components of authentication and verification experiences for well-known brands.  For example, Twilio tells its customers that, when a new user signs up for your application, there are many layers of security you can put in place, and one of the best is account verification via SMS.

**178.**    Twilio recommends that its customers perform account verification before a registration is fully completed, to complete registration.

**179.**    Twilio encourages its customers to implement Twilio's REST API (using Twilio SMS for example) to strengthen or replace a username and password.

**180.**    Twilio markets Twilio's REST API by telling customers to add strong authentication to customer applications with second-factor passwords sent to a user's phone via SMS or Voice, for an extra layer of security.

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

**181.**    Twilio recommends to its customers to make it harder for evildoers to compromise a user account by also validating something a user has, like a mobile phone, and to use Twilio's REST API because it helps keep user accounts secure.

**182.**    Twilio advises customers on its website and in live demonstrations to secure their applications with two-factor authentication and to add two-factor authentication to any application.

**183.**    Twilio instructs its customers to protect accounts from weak passwords and eliminate unauthorized access by integrating Twilio's REST API into their applications.

**184.**    Twilio also continued to provide its services and technologies described herein, used at the direction and control of Twilio's customers, with the knowledge of, or willful blindness to, the fact that the induced acts constituted patent infringement.

**185.**    As the result of Twilio's activities, encouragements, and instructions, and its customers' activities in utilizing technology of the claims of the '792 patent, Twilio is liable for indirect infringement.

**186.**    As a direct and proximate result of Twilio's acts of infringing the '792 Patent, TeleSign has suffered injury and monetary damages for which TeleSign is entitled to relief in the form of damages for lost profits and in no event less than a reasonable royalty to compensate for Twilio's infringement.

**187.**    Twilio has knowingly, willfully, and deliberately induced infringement of the '792 Patent in conscious disregard of TeleSign' rights, making this case exceptional within the meaning of 35 U.S.C. § 285 and justifying treble damages pursuant to 35 U.S.C. § 284.

**188.**    Upon information and belief, Twilio will continue to induce infringement of the '792 Patent, causing immediate and irreparable harm to TeleSign unless this Court enjoins and restrains Twilio's activities, specifically the acts of making, using, selling, offering for sale, and importing Authy and Twilio's REST API, and instructing its

customers to make, use, sell, offer for sale, and import products and services including Authy and Twilio's REST API.

**189.**   The induced infringement of the '792 Patent by Twilio has, and will, deprive TeleSign of optimal sales, licensing fees, royalties and other related revenue which TeleSign would have made or would enjoy in the future and will cause TeleSign added injury and damage unless Twilio is enjoined from inducing infringement of the '792 Patent until the expiration of the '792 Patent.

## X.  Willful Infringement

**190.**   All of the preceding paragraphs are incorporated by reference herein.

**191.**   Twilio's infringement of the '792 Patent is willful.

**192.**   Twilio has had knowledge of the '792 Patent (including actual knowledge) as described herein.

**193.**   Twilio acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, the '792 Patent, and the objectively-defined risk was either known to Twilio or so obvious that it should have been known to Twilio.

**194.**   For example, as explained in Section VII, Twilio was aware of TeleSign's pending patent application, its published claims, and the Notice of Allowance indicating those claims would issue as the '792 Patent, as alleged above and was aware of TeleSign's patent family and TeleSign's allegations regarding Twilio's two-factor authentication technology in TeleSign I—but did not avoid or discontinue its infringement of the '792 Patent.

**195.**   Twilio knew of the objectively high risk of infringement of TeleSign's '792 Patent given Twilio's analysis in TeleSign I.

**196.**   Twilio was aware that its motion for judgment on the pleadings was denied, regarding the alleged invalidity Parent Patents in the same patent family as the '792 Patent, in TeleSign I.  *See* TeleSign I, ECF No. 123.

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

**197.**    The '792 Patent issued despite the Patent Office's consideration of additional prior art and Twilio's Section 101 patent-ineligibility motion—further indicating that the '792 Patent was duly issued and will remain valid.

**198.**    Despite TeleSign I and service of the original Complaint in this action (ECF No. 1) and the allegations in this First Amended Complaint, Twilio continues to convey or make available the information contained in this First Amended Complaint.

## XI. PRAYER FOR RELIEF

154.    TeleSign demands trial by jury for all issues so triable by a jury.

WHEREFORE, TeleSign respectfully requests this Court to:

A.    Enter judgment for TeleSign that Twilio has infringed and is infringing one or more claims of the '792 Patent;

B.    Enter judgment for TeleSign that Twilio has actively induced infringement and is actively inducing infringement of one or more claims of the '792 Patent;

C.    Enter judgment for TeleSign that Twilio has willfully infringed and is willfully infringing one or more claims the '792 Patent;

D.    Issue a permanent injunction enjoining Twilio (including its officers, directors, employees, agents, customers and all persons acting in concert with them) from infringing the '792 Patent;

E.    Order that Twilio pay compensatory damages to TeleSign for Twilio's infringement of the '792 Patent, including but not limited to, damages for lost profits and in no event less than a reasonable royalty;

F.    Award damages based TeleSign's provisional rights under 35 U.S.C. § 154(d);

G.    Find this to be an exceptional case, award TeleSign treble damages due to Twilio's deliberate and willful conduct, and order Twilio to pay TeleSign's costs of suit and attorneys' fees;

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

H.    Award TeleSign interest and costs under 35 U.S.C. § 284;

I.    Award TeleSign pre-judgment interest; and

J.    Order such other relief as the Court considers appropriate.


Dated:   September 2, 2016              Signed:*/s/ Mary Jane Peal*

                                        Gary Miller
                                        (gmiller@shb.com)
                                        Shook, Hardy & Bacon LLP
                                        111 S. Wacker Dr.
                                        Chicago, IL 60606
                                        Telephone:  312.704.7700
                                        Fascimile:  312.558.1195

                                        Jesse Camacho
                                        (jcamacho@shb.com)
                                        Mary Jane Peal
                                        (mpeal@shb.com)
                                        Shook, Hardy & Bacon LLP
                                        2555 Grand Blvd.
                                        Kansas City, MO 64108
                                        Telephone:  816.474.6550
                                        Fascimile:  816.421.5547

                                        Tony M. Diab
                                        (tdiab@shb.com)
                                        Shook, Hardy & Bacon L.L.P.
                                        Jamboree Center
                                        5 Park Plaza, Suite 1600
                                        Irvine, California 92614
                                        Telephone:  949.475.1500
                                        Facsimile:   949.475.0016

                                        Attorneys for Plaintiff
                                        TELESIGN CORPORATION

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

[This page intentionally left blank.]

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

[This page intentionally left blank.]

FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT